IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ENRIQUE RESENDIZ, G05736,    ) | |
| ) | |
| Petitioner,    ) | No. C 11-5218 CRB (PR) |
| ) | |
| vs.    ) | ORDER DENYING PETITION |
| ) | FOR A WRIT OF HABEAS |
| GREG LEWIS, Warden,    ) | CORPUS |
| ) | |
| Respondent.    ) | |
| ) | |

Petitioner, a state prisoner at Pelican Bay State Prison, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction from Santa Cruz County Superior Court on the ground that the trial court improperly restricted his cross-examination of prosecution witness Juan Pablo Hernandez. For the reasons that follow, the petition will be denied.

**STATEMENT OF THE CASE**

On November 30, 2007, petitioner was convicted by a jury of first-degree murder with the special circumstance that the murder was committed while petitioner was an active participant in a criminal street gang and that the murder was carried out to further the gang's activities. The jury also found true the enhancement allegations that petitioner committed the murder for the benefit of a criminal street gang; and that petitioner personally used a firearm, intentionally discharged a firearm and intentionally discharged a firearm causing death.

On January 25, 2008, the trial court sentenced petitioner to life without the possibility of parole consecutive to a term of 25 years to life.

On March 30, 2010, the California Court of Appeal found instructional error as to the special circumstance and gang allegation, and reversed and remanded for retrial on those allegations or, in the event the prosecutor elected not to retry those matters, for resentencing.

On July 19, 2010, the California Supreme Court denied review.

On August 30, 2010, the trial court resentenced petitioner to 50 years to life because the prosecutor declined to retry the remanded matters.

On November 29, 2010, the United States Supreme Court denied certiorari review.

On October 25, 2011, petitioner filed this federal petition for a writ of habeas corpus under § 2254.

On February 7, 2012, the court found that the petition, liberally construed, stated a cognizable claim for relief under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer to the order to show cause, but petitioner did not file a traverse.

**STATEMENT OF THE FACTS**

The California Court of Appeal summarized the relevant facts of the case as follows:

> Defendant was a member of City Hall Watsonville (CHW), a Norteno gang. He frequently wore red and was shown in various photographs flashing CHW and Norteno gang signs. Defendant also associated with other CHW members. During the week, defendant lived with his wife and her family in Redwood City. On weekends, he stayed at his family's home at 422 Second Street in Watsonville.
>
> At approximately 5:15 p.m. on February 19, 2006, Arturo "Cura" Cardenas was murdered on Locust Street in Watsonville. Cardenas was wearing a blue shirt and had the letters "S-U-R" tattooed on the back of his head. "SUR" is used as an abbreviation

2

for "Sureno." Cardenas was involved with the Poor Side gang, a Sureno gang.

Sandra Diaz, who was Cardenas's girlfriend, spent most of the day with him on February 19, 2006. Late in the afternoon, she was driving Cardenas's car while Cardenas was in the passenger seat and her two-year-old child was in the back seat. When they were on Locust Street, Cardenas saw his friend Alejandro "Pepe" Hernandez and told Diaz to stop. Before Cardenas left the car, he mentioned that he saw four "chapetes," which is an insulting term for Nortenos. Diaz then saw four men walking towards Cardenas. One of the men, who was wearing a red shirt under his black sweater, walked across the street. He was hiding his hands under his sweater. Diaz told Cardenas, who appeared scared, to get in the car. As Cardenas was about to open the car door, the man came closer. Cardenas asked, "What's up," and the man pulled out a gun. Cardenas told him to calm down, turned around, and started running away from the car. The man with the gun ran after him. Diaz left and did not see the shooting. Diaz identified defendant as the man with the gun. She was "[o]ne hundred" percent sure of her identification.

Alejandro Hernandez was Cardenas's friend and a member of the Poor Side gang. Shortly after 5:00 p.m. on February 19, 2006, he was sitting in his car on Locust Street. He had just smoked $10 worth of methamphetamine when he saw Cardenas. Cardenas walked over to his car and told him to be careful because there were Nortenos in the area. When Alejandro Hernandez looked in his rearview mirror, he saw several men, who were approaching with their hands in their pockets. After Diaz called to Cardenas, he walked back towards his car. However, another man, who was wearing a red shirt under a black sweater with a hood, approached. He and Cardenas made some movements as if they were "going to get into it." The man then removed a gun from under his shirt and shot Cardenas as Diaz drove away. Alejandro Hernandez was about to drive toward Cardenas when one of the other men reached in his pants. This gesture scared him and he drove away. Alejandro Hernandez described the shooter as skinny, and "[l]ike a head" shorter than 5 feet 9 inches. He selected defendant from a photo lineup shortly after the murder and identified defendant as the shooter at trial.

Maria Guadalupe Ortega, Cardenas's cousin, was at her parents' house at 220 Second Street on the night of the shooting when she heard three gunshots. Her cousin Jose, who had been outside, told her that he had seen some men with guns. She also testified that there was a party at her parents' house a year and a half or two years earlier. At that time, Cardenas and other family members were present. Some neighbors, including Ernesto "Miko" Perez, Luis Hernandez, and defendant, arrived and were trying to create problems. Defendant called Cardenas "scrapa," a derogatory term for a Sureno, and threatened to beat and kill him. Defendant

3

said, "I don't want that fucking little scrap cousin here on this street because if they come here, here on this street, they won't get out in good shape." He also told Cardenas, "We're going to beat the fuck out of you, you fucking scrap," and "I know that you have relatives that are Surenos, and I'll kill them all." After Ortega threatened to call the police, defendant, Perez, and Luis Hernandez left. Several years earlier, these three men also beat one of Ortega's friends.

Other individuals testified about their observations at the time of the murder. Jorge Lopez lived at 236 Locust Street. He heard two to four gunshots at about 5:15 p.m. in February 2006. When he saw a body lying on the lawn, he called 911. Rosa Rivas parked her car on Second Street at about 5:00 p.m., and saw three or four men exiting the blue house. She also saw two men, whom she identified as defendant and Perez, walking from the driveway.

Micaela Luna was having an affair with defendant in 2006. On February 18, 2006, Luna picked up defendant at his family's house in Watsonville and drove him to her house in Castroville where defendant spent the night. The next day, Luna drove defendant back to Watsonville and left him at Luis Hernandez's house at about 5:10 p.m. Defendant was wearing a black sweater. After Luna had driven a few blocks away, defendant phoned her and asked her to return because he had left something in her car. Luna returned to Luis Hernandez's house, but defendant was not there. She left, and defendant called her again. He asked her to pick him up, and his voice was "in a hurry, just like hurry up." Defendant then called her a third time and told her to pull into the driveway. When defendant exited the house, he was wearing a white T-shirt. Luna and defendant returned to her home in Castroville where defendant spent the night. The following morning, she dropped him off at a gas station where his brother worked.

Juan Pablo Hernandez's sister is defendant's wife. On February 20, 2006, defendant returned to his house in Redwood City where he lived with his wife, their two children, [Juan Pablo] Hernandez [(Hernandez)], and other family members. The previous evening, Hernandez had learned that someone had been killed close to his grandmother's house at 311 Second Street. Hernandez asked defendant if he knew anything about it. Defendant initially said that he did not know anything. However, defendant then stated that "there was a confrontation at the corner" during which defendant asked "an old cat" or gang member if he was a "scrap." The man did not respond, but continued walking toward defendant and pulled out a knife. Defendant told Hernandez that he shot the man four or five times and then walked to his house at 422 Second Street.

On February 21, defendant called Hernandez from Los Angeles and asked him to tell the police that he was in Redwood City that weekend. He also asked him to tell his mother and sister

4

to make the same statement to the police.

Officer Michael McKinley testified that he and another officer transported defendant from Redwood City to Watsonville on February 24, 2006. Defendant first told Officer McKinley that his girlfriend Miki Leon lived in Castroville, but then claimed that she lived in Salinas. According to defendant, she was his second alibi, but defendant did not want her involved. Officer McKinley obtained her phone number from defendant, and learned that her full name was Micaela Leon Luna. While Officer McKinley was talking to Luna, defendant shouted, "Don't talk to him." Luna told him that she lived in Castroville.

On the same day, Officer Zamora interviewed defendant. Defendant told the officer that he went to Watsonville on February 17 and spent some time with Luis Hernandez until 10:00 or 11:00 p.m. He stayed the night at his parents' house on Second Street in Watsonville and returned to Redwood City the following morning. He then spent Saturday and Sunday in Redwood City. Defendant first stated that he had never held a gun. He then stated that his father had a gun. However, he later admitted that he was the man in a photograph holding a .45 caliber gun.

Defendant provided another version of his whereabouts when the shooting occurred. He stated that he was with his girlfriend on February 19, but did not want his family to learn that he was having an affair. Later, he admitted that he was on Second Street on February 19, but denied that he was the shooter. Defendant also stated that Luis Hernandez was a member of CHW and that many of his friends were in this gang.

Luna was interviewed by the police on February 24, 2006. She initially told the officer that defendant was with her on February 19 in Castroville. However, after she learned that defendant might have been involved in a murder, she stated that she drove defendant back to Watsonville. A few days later, defendant called her from jail and asked her to say that he was with her.

Defendant called his sister from jail and told her "that girl" "is the only one that can help" him because he was with her. Defendant also asked his wife to speak to her. On another occasion, defendant asked other women to go talk to her and tell her that the police were "just trying to scare" her.

Maria Rosario Hernandez, defendant's mother-in-law, testified that she held a barbecue at her house in Redwood City on February 19, 2006. She saw defendant that morning, but he did not attend the barbecue. Later that week, her son asked her to tell the police that defendant was at the barbecue.

The police did not recover the murder weapon, which was a Colt .45 caliber automatic gun. The shooter fired seven shots and

5

>hit Cardenas five times.  A knife was found next to Cardenas's body.
>
>The police conducted searches of defendant's residences in Watsonville and Redwood City. They found a CD case with "City Hall Watson" written in red under defendant's bed, white shoes with red trim, and a notebook with "City Hall Locos Nortenos" and "Nortenos" on it. "CHW," "bandit," "CML," "Watsonville via Norteno," "CHW 14," "14," and "XIV" were written on various structures in the backyard and front porch of the Watsonville residence. The police also found ammunition and weapons at the same residence. They found two .45 caliber bullets in a flower pot in one of the bedrooms, a box of .45 caliber bullets in another bedroom, a holster that would fit a "large frame" firearm, and .9 millimeter semiautomatic gun, or Tec-9, in a storage shed in the backyard. They also found six .9 millimeter bullets in defendant's vehicle.

People v. Resendiz, No. H032537, 2010 WL 1218792, at **1-4 (Cal. Ct. App. Mar. 30, 2010) (footnotes omitted).

## STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than

6

[the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings, as opposed to the dicta, of the Supreme Court at the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## DISCUSSION

Petitioner claims that the trial court violated his right to confrontation by not allowing him to cross-examine Hernandez about the tactics used by the police when they interviewed Hernandez shortly after the murder. According to petitioner, such cross-examination would have revealed that the police officers' threats and coercion caused Hernandez to change his story.

/

7

The California Court of Appeal rejected petitioner's claim on the ground that the trial court did not abuse its discretion in limiting the cross-examination of Hernandez. People v. Resendiz, 2010 WL 1218792, at *8. It also determined that, "considering the strength of the prosecution's case and that most of Hernandez's testimony was corroborated by other witnesses," "any error was harmless beyond a reasonable doubt." Id. at *9. Petitioner's claim is without merit because the state court's decision that any error was harmless was not an unreasonable determination. See 28 U.S.C. § 2254(d).

A.  Factual Background

The California Court of Appeal summarized the facts surrounding Hernandez's arrest and interrogation as follows:

> A few days after the homicide, defendant and Hernandez were arrested in Redwood City. Detectives Monica Herrera, Zamora, McKinley, and Jimmy Johnson interviewed Hernandez for approximately eight hours. Detective Herrera conducted most of the interview during which the police repeatedly offered Hernandez food and soda or water.
>
> Hernandez initially stated that defendant was in Redwood City on the day of the murder, and provided an account of his activities that weekend. Detective Herrera told Hernandez that if he was lying for defendant, he was going "down for a homicide," and his contact with his family would be extremely limited. The police noted that he provided details of his activities on February 17 and 18, but was very vague about February 19, and they repeatedly stated that he was either a suspect or a witness. At this point, Hernandez stated that he "didn't even know he had done it," admitted that defendant was not in Redwood City, but claimed he did not know where defendant was on February 19. Hernandez also stated that "[h]e never told me he killed nobody." According to Hernandez, defendant went to Watsonville on February 17 and returned to Redwood City on February 20. On the night of February 19, Hernandez received a call from his sister, defendant's wife, who was in Mexico. She sounded scared and nervous, and wanted to know when he had last seen defendant. She told him that "they killed somebody in Watsonville" near their grandparents' house, but she did not know the victim's identity. Hernandez was unable to get information about the shooting from the Internet.

/

The police told Hernandez that additional witnesses had identified defendant as the shooter and they threatened to charge him as an accessory. Hernandez stated that he provided defendant with an alibi, because defendant said police were looking for him. According to Hernandez, defendant "never told [him] he had done it." After the police urged him to tell the truth, Hernandez admitted that defendant told him that he was there. Hernandez stated that defendant didn't tell him that he had a gun. However, when Hernandez was asked what defendant did with the gun, Hernandez said he "[t]ossed it" and agreed that "it fuckin' boomed when he shot the gun." Hernandez then repeated that defendant did not tell him that he did it.

After Detective Herrera focused on the need for Hernandez to make a choice between the various members of his family, and asked him what his mother would do in his situation, Hernandez expressed concern about retaliation. Detective Herrera explained the various possibilities for protection and refused his request to talk to his mother. Detective Johnson then threatened Hernandez with prosecution and provided a graphic description of sexual assault in prison. Detective Johnson also stated that Hernandez's mother did not raise him to be a liar, and Hernandez began recounting his conversation with defendant. Defendant told him that he shot the victim four or five times.

At the end of the interview, Hernandez told the officers that their treatment of him was "cool" and that they didn't disrespect him. He felt that they tricked him "a little" because they repeated the questions a lot. Hernandez also gave his opinion that "[m]en don't know how to lie." When the officers asked if there was something that they could have done better, Hernandez replied that they were "cool," but he thought that the room was "boring" and he was a little cold. Hernandez also believed that he would need to watch his back his whole life and was worried about someone coming after him. Though he wanted to know more about the witness protection program, he felt safe going home "[f]or a while."

Prior to trial, defendant moved to exclude Hernandez's testimony on the ground that it had been coerced, or alternatively, to play the videotape of his interview by the police. The trial court denied the motion on the ground that the police tactics were not coercive. However, the trial court also noted that defendant would have the "opportunity to cross-examine and can cross-examine about the things that were said or done during the interview."

The prosecutor argued that the trial court should preclude cross-examination as to what was said during the interview because it was not relevant and its probative value was outweighed by its prejudicial effect. Defense counsel argued that the police interview was coercive, and he also noted that he sought to cross-examine the witness. The trial court stated: "You are entitled to cross-examine the witness about whether the testimony is coerced. I am not going

>to make any rulings about your cross-examination in advance. I am not going to make you submit questions in advance because cross-examination is, as Justice Scalia will tell you, your major tool of defense. But it's very unlikely that they are going to get to play any part or place in front of the jury any part of the interrogation preceding because it's not relevant to whether that coercion still exists unless you can create some theory that you think is viable as to why that might exist such as – I am not going to suggest any – but the issue is current day coercion not coercion 20 months ago. [¶] . . . [¶] . . . But right now I am not going to make a pre-trial ruling that limits his cross-examination because we have to wait and see how he cross-examines and whether it's subject to limitation as the questions are asked." The trial court then granted the prosecutor's request for an Evidence Code section 402 hearing regarding the voluntariness of Hernandez's testimony.
>
>Prior to Hernandez's trial testimony, the trial court offered to conduct an Evidence Code section 402 hearing. Defense counsel again sought to exclude Hernandez's testimony on the ground that the police used coercive tactics during the interview. The prosecutor disputed that the interview was coercive. After defense counsel declined to call any witnesses, the trial court found that there was insufficient evidence that Hernandez's statements were the product of police coercion, and thus defendant's due process rights had not been violated. The trial court also concluded that defendant would not be permitted to cross-examine Hernandez regarding police statements that were made during the interview unless defendant could make an "offer of proof that anything that happened that day is still – has an operational effect on Mr. Hernandez's testimony today."

People v. Resendiz, 2010 WL 1218792, at **6-8.

B.   Federal Law

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Delaware v. Fensterer, 474 U.S. 15, 20 (1985). Trial judges retain wide latitude to impose reasonable limits on cross-examinations based on concerns about, among other things, "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). But prohibiting all inquiry into a particular and relevant avenue of impeachment raises Confrontation Clause concerns. See id.; Fenenbock v.

10

Director of Corrections, 692 F.3d 910, 919-20 (9th Cir. 2012). A defendant establishes a violation of the Confrontation Clause if "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had [he] been permitted to pursue his proposed line of cross-examination." Van Arsdall, 475 U.S. at 680.

To determine whether a violation of the Confrontation Clause occurred under Van Arsdall, courts evaluate three factors: (1) whether the evidence was relevant; (2) whether there were legitimate interests that outweighed the defendant's interests in presenting the evidence; and (3) whether the exclusion of the evidence left the jury with sufficient information to assess the credibility of the witness. Wood v. Alaska, 957 F.2d 1544, 1549-50 (9th Cir. 1992); Averilla v. Lopez, 862 F. Supp. 2d 987, 998 (N.D. Cal. 2012).

A showing of constitutional error under the Confrontation Clause only merits habeas relief if the error was not harmless, that is, if it had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Holley v. Yarborough, 568 F.3d 1091, 1100 (9th Cir. 2009) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

C.   Analysis

Petitioner claims the trial court violated his right to confrontation because his proposed cross-examination of Hernandez about the tactics used by the police when they interviewed Hernandez would have revealed that Hernandez's testimony was coerced and unreliable. Application of the three factors courts consider to determine whether a Confrontation Clause violation occurred under Van Arsdall suggest that a violation did occur.

With respect to the first factor, the proposed line of cross-examination about the coercive circumstances surrounding Hernandez's police interrogation

11

certainly was relevant to impeach Hernandez's credibility. The jury would have heard how Hernandez's arrest and subsequent eight-hour interrogation, compounded by threats of prosecution and vivid descriptions of prison assault, may have influenced Hernandez's change of story and sudden recounting of petitioner's confession. Discrediting Hernandez's testimony in this fashion could have shown that Hernandez had reason to shift suspicion away from himself to petitioner and outright fabricate. See Holley, 568 F.3d at 1099.

   Turning to the second factor, the state did not have legitimate interests that outweighed petitioner's interests in pursuing the proposed line of cross-examination. The state argues that because petitioner was allowed to probe the weaknesses in Hernandez's testimony in other ways, its interest in limiting Hernandez's cross-examination outweighed any detriment to petitioner. But it is well established that limits on cross-examination must be reasonable and proportionate to the purpose it is intended to serve. See Michigan v. Lucas, 500 U.S. 145, 151 (1991). If the trial court was concerned about the cross-examination becoming too lengthy or Hernandez being harassed, it could have limited the time allotted to discussion of the circumstances surrounding Hernandez's interrogation, rather than excluding all discussion. See Holley, 568 F.3d at 1100. Completely limiting Hernandez's cross-examination to exclude any testimony regarding the circumstances surrounding his interrogation was both unreasonable and disproportionate. See id. at 1099-1100.

   Finally, examination of the third factor suggests that the exclusion of any testimony regarding the circumstances surrounding Hernandez's interrogation deprived the jury of information critical to assessing fully Hernandez's credibility. Courts often look at several circumstances to determine the potential impact cross-examination might have had upon a jury. See Van Arsdall, 475

U.S. at 684. Not all of the circumstances support petitioner's claim here. But the totality of the circumstances weighs in favor of petitioner.

An important consideration is the overall strength of the prosecution's case and here "evidence of guilt was, if not overwhelming, certainly weighty." Merolillo v. Yates, 663 F.3d 444, 456 (9th Cir. 2011). But another important consideration is the importance of the testimony to the prosecution's case. Hernandez's testimony essentially brought petitioner's confession before the jury. "A defendant's confession is 'probably the most probative and damaging evidence that can be admitted against him,' so damaging that a jury should not be expected to ignore it even if told to do so, and because in any event it is impossible to know what credit and weight the jury gave to the confession." Arizona v. Fulminante, 499 U.S. 279, 292 (1991) (internal citations omitted). If petitioner had been permitted to cross-examine Hernandez about the circumstances surrounding his interrogation and his motives for implicating petitioner, the jury may not have credited Hernandez's recitation of petitioner's confession. This, together with the fact that the trial court limited Hernandez's cross-examination to exclude <u>any</u> testimony regarding the circumstances surrounding his interrogation, suggest that the jury was deprived of information critical to assessing fully Hernandez's credibility and that the third factor is satisfied.

In sum, evaluation of the three factors courts consider to determine whether a Confrontation Clause violation occurred under Van Arsdall suggest that a violation occurred because a reasonable jury might have received a significantly different impression of Hernandez's credibility had petitioner been permitted to pursue his proposed line of cross-examination. See Van Arsdall, 475 U.S. at 680. But we need not decide whether the California Court of

Appeal's determination that there was no Confrontation Clause violation was objectively unreasonable under 28 U.S.C. § 2254(d) because the state court's additional determination that any error was harmless beyond a reasonable doubt was <u>not</u> objectively unreasonable. See Fry v. Pliler, 551 U.S. 112, 119 (2007) (federal court may not award habeas relief under § 2254 unless state court's harmlessness determination itself was unreasonable); Ponce v. Felker, 606 F.3d 596, 606 (9th Cir. 2010) (same).

The evidence against petitioner was substantial and weighty. Petitioner had previously threatened to beat and kill Cardenas because he was a member of a rival gang. Two eyewitnesses, Sandra Diaz and Alejandro Hernandez, identified petitioner as the man who confronted and shot Cardenas. Micaela Luna, petitioner's girlfriend, placed petitioner at the murder scene at the time of the shooting. So did neighborhood resident Rosa Rivas. A photograph taken two months before the murder showed petitioner with a gun matching the description of the murder weapon. After the murder, petitioner and his family asked Luna to provide an alibi for petitioner. Petitioner lied to the police about Luna's and his whereabouts, but eventually admitted being in Watsonville at the time of the shooting. In view of this evidence, and that most of Hernandez's testimony was corroborated by other witnesses, the California Court of Appeal's determination that any error in limiting petitioner's cross-examination of Hernandez was harmless cannot be said to be objectively unreasonable. See Ponce, 606 F.3d at 606. In fact, the court is satisfied that the trial court's limitation on petitioner's cross-examination of Hernandez, even if constitutionally erroneous, did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

/

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED: Nov. 16, 2012

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.11\Resendiz, J.11-5218.denial.final.wpd